**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffery J. Harris,<br><br>    Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security Administration<br><br>    Defendant. | No. CV-11-743-TUC-DTF<br><br>**ORDER** |

    Plaintiff Jeffery Harris brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). Plaintiff filed an opening brief. (Doc. 20.) Defendant filed a responsive brief and Plaintiff replied. (Docs. 21, 24.) The parties consented to exercise of jurisdiction by a Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1). (Docs. 7, 13.) The Court finds that the Commissioner's decision should be upheld and Plaintiff's complaint dismissed.

## **PROCEDURAL HISTORY**

    Harris filed an application for Supplemental Security Income (SSI) on March 27, 2007. (Administrative Record (AR) 192.) Harris alleged disability from March 1, 1998. (AR 264.) His application was denied upon initial review (AR 84, 125-28) and on reconsideration (AR 85, 130-33). A hearing was held on March 25, 2009 (AR 12-25), after which ALJ M. Kathleen Gavin found, at Step Five, that Harris was not disabled (AR 86-98). The Appeals Council remanded the case because the ALJ considered post-hearing evidence without

proffering it to the claimant for response, and the ALJ did not sufficiently address the opinion of treating physician Lindstrom. (AR 100-02.) In August 2010, Harris filed a claim for Disability Insurance Benefits (DIB) alleging disability from July 12, 1977; this claim was consolidated with his SSI claim on remand. (AR 402.) A second hearing was held on January 18, 2011 (AR 37-83), after which ALJ Larry Johnson found, at Step Five, that Harris was not disabled (AR 103-16). The Appeals Council granted review and modified portions of ALJ Johnson's decision, but adopted his factual summary, significant portions of his findings and his ultimate conclusion that Harris was not disabled. (AR 4-7.)

## **FACTUAL HISTORY**

Harris was born on March 17, 1953, making him 24 years of age at the alleged onset date of his disability. (AR 264.) He has a masters degree in environmental engineering. (AR 162.) Harris entered the military in 1976 and was discharged the following year on medical grounds after experiencing an inability to concentrate, forgetfulness, fatigue, eating and sleeping a lot, and feeling anguish due to wanting out of the Army. (AR 441, 669.) Since that time, he has earned nothing in many years, up to almost $8000 in 1992. (AR 269, 274.) In recent years he has done a bit of work out of his house, fixing computers or resolving network problems a few hours per week. (AR 62, 279.) In 1990, Harris experienced cardiac arrest, after which a pacemaker was implanted. (AR 69, 632.) The symptoms that Harris asserts prevent him from working are frequent shortness of breath, dizziness, lightheadedness, pre-syncope and syncope episodes (four to six times per week), convulsions and confusion. (AR 63-67.)

In February 2008, Harris told examining psychologist Martinez that he lived alone and cleaned every other day. (AR 482.) When he had "bad days" he reported difficulty staying awake and mental confusion. (*Id.*) When he was feeling fine, he drove, worked on a wall he was rebuilding, visited with friends and served on the community Planning and Zoning Committee. (*Id.*) He had provided similar information to examining physician Rothbaum in June 2007. (AR 452.) In July 2008, he informed his new doctor that he was cycling 30 to 40 miles per week (in March 2011, he sustained minor injuries that he reported were caused by

- 2 -

a seizure while riding his bicycle). (AR 626, 724.) As of 2010, Harris had a person living in his house who reported working outside the home but providing care for him when she was there. (AR 374.)

From at least 2001 until Plaintiff began receiving services at the Veteran's Administration (VA) medical facility in 2008, his primary care doctor was Stephen Lindstrom. Dr. Lindstrom submitted two documents on behalf of Harris stating that he is totally disabled and cannot work. (AR 509, 511.) Harris was examined in 2007 by Dr. Jerome Rothbaum, who concluded that Plaintiff could do medium work with minimal limitations. (AR 452-57.) Non-examining physician Dr. Frank Shallenberger concurred with Dr. Rothbaum's recommendations. (AR 472-79.) Psychologist Machelle Martinez examined Harris in 2008 and concluded he had a cognitive disorder and found that he had some limitations with memory and detailed instructions. (AR 481-88.) Non-examining psychologist Randall Garland, relying on Dr. Martinez and other records, opined that Plaintiff could do competitive, remunerative, unskilled work. (AR 507.) Cardiologist Stephen Gerber, testifying at the 2011 hearing, stated that Plaintiff was physically limited only from working around hazards such as heights and machinery. (AR 44-45.) After a number of tests, Plaintiff's treating doctor at the VA, Mark Hendrickson, has been unable to discover a source for Harris's reported symptoms. (AR 654.) There is nothing in the record from a VA physician indicating that Harris has physical or mental limitations on his ability to work.

ALJ Johnson found that Plaintiff has two severe impairments, sick sinus syndrome (which effects the rhythms of his heart), status post pacemaker implantation, and a cognitive disorder. (AR 109.) He determined that Plaintiff has the residual functional capacity (RFC) to do light work, avoiding heights and machinery, and was limited to unskilled work. (AR 110.) Harris has no past relevant work but the ALJ concluded there were a significant number of jobs available to Harris in the national economy. (AR 114-15.) The Appeals Council adopted the ALJ's conclusion that Harris was not disabled but found that he has the RFC to perform medium work. (AR 4-7.)

## STANDARD OF REVIEW

The Commissioner employs a five-step sequential process to evaluate DIB and SSI claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings of the Commissioner are meant to be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must

consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

## DISCUSSION

On the first two pages of his opening brief, Plaintiff lists ten issues for review. (Doc. 20 at 1-2.) Plaintiff couches many of his claims as failures by the ALJ to comply with the Appeals Council's remand and categorizes some of his claims as issues not decided by the Appeals Council. His characterization of the issues would technically put many of his claims outside this Court's review because it is the Appeals Council's decision that is under review and he asserts they did not decide most of his claims. The Court is statutorily tasked to evaluate the final decision of the Commissioner to determine if it based on legal error or not supported by substantial evidence. 42 U.S.C. § 405(g); *Aukland*, 257 F.3d at 1035. The final decision in this case is the second decision of the Appeals Council, which adopted portions of ALJ Johnson's decision. *See* 20 C.F.R. § 422.210(a). Because Harris is representing himself the Court liberally construes his brief. *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Thus, to the extent possible, the Court interprets the claims as alleging error by the Appeals Council (including the adopted portions of the ALJ's decision) but does not consider whether the ALJ complied with the first Appeal Council's remand directions.

Within the argument section of his brief, Harris discusses only seven of the ten claims he listed on the cover of his brief, and the Court evaluates only those for which he provided argument. (*Id.* at 13-27.) The Court treats the first two issues as one claim, addressing below the following six claims that the ALJ erred in his weighing of treating physician Dr. Lindstrom's opinion; in his weighing of expert witness Dr. Gerber's opinion; in failing to obtain expert evidence regarding Harris's cognitive disorder; in his use of the expert vocational testimony; in his discounting of the lay witness testimony; and in his weighing of non-treating physician opinions.

The Court finds it expedient initially to address an evidentiary issue that arises repeatedly throughout Plaintiff's brief and is relevant to many of his claims. Harris relies

- 5 -

1  often upon his own statements in the record as medical evidence and fact. Although these
2  documents can be considered, they are not objective medical evidence nor are they opinions
3  by an acceptable medical source. In addition to Plaintiff's statements, he submits several
4  documents with information from monitoring he conducted but for which there is little to no
5  medical feedback in the record. These include a log of blood pressure readings (AR 699-
6  700), a few numbers scrawled on scrap paper with an explanation by Plaintiff as to the
7  meaning (AR 716-17), and a self-conducted pulse oximeter report (AR 719-20). These do
8  not qualify as "medically acceptable clinical diagnostic techniques" or "medically acceptable
9  laboratory diagnostic techniques" as set forth in the regulations. 20 C.F.R. §§ 404.1528 (b),
10 (c), 416.928 (b), (c); SSR 96-2p. Therefore, the Court does not treat these documents as
11 medical evidence or opinion but does consider them in its review of the whole record.

**Treating physician, Dr. Lindstrom**

13 Plaintiff's claims A and B are both based on his assertion that the ALJ failed to give
14 treating physician Dr. Lindstrom's opinion sufficient weight or to provide sufficient reason
15 for rejecting it.

16 In July 2007, Dr. Stephen Lindstrom, Plaintiff's treating physician, provided a
17 statement that Harris is medically disabled and cannot reliably drive or maintain a schedule
18 for employment due to his sick sinus syndrome. (AR 511.) Dr. Lindstrom attested that
19 Plaintiff's symptoms had been worsening over the prior few years and would likely continue
20 to gradually worsen. (*Id.*) He identified the symptoms as lightheadedness, confusion,
21 shortness of breath, fatigue, and syncope. (*Id.*) In March 2008, Dr. Lindstrom submitted
22 additional information emphasizing the episodic nature of Harris's impairment and stating
23 that Harris has periods in which his pulse and blood pressure are debilitatingly low. (AR
24 509.) The doctor noted that during these periods syncope or near syncope are common and
25 even simple tasks are difficult as Harris's cognitive abilities are severely limited. (*Id.*) Thus,
26 Dr. Lindstrom opined that Harris cannot maintain a routine schedule necessary for regular
27 employment. (*Id.*)

1    Several doctors offered opinions in conflict with that of Dr. Lindstrom, including Drs.
2 Rothbaum, Shallenberger and Gerber. (AR 42-60, 452-57, 472-79.) When there is a conflict
3 between the opinions of a treating physician and other physicians, "[i]f the ALJ wishes to
4 disregard the opinion of the treating physician, he or she must make findings setting forth
5 specific, legitimate reasons for doing so that are based on substantial evidence in the record."
6 *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Thus, the Court
7 assesses whether the ALJ's rejection of the treating physician's opinion is based on
8 legitimate reasons supported by substantial evidence.

9    The ALJ gave little weight to the opinion of Dr. Lindstrom because he found no
10 objective evidence in the medical records to support the severity and frequency of syncopal
11 episodes as relied upon by the doctor. (AR 113.) Further, the ALJ found that the information
12 Harris shared with Dr. Lindstrom was inconsistent with the reports he provided to the doctors
13 at the VA. (*Id.*) Dr. Lindstrom's evaluation was based solely on input from Harris and not
14 on any clinical analysis or medically objective examination, and the ALJ noted that it was
15 inconsistent with the balance of the medical record. (*Id.*)

16    The ALJ provided specific reasons for discounting Dr. Lindstrom's opinion and the
17 Court reviews each one to see if they are supported by substantial evidence. The only
18 evidence in the record of the volume of syncope episodes upon which the doctor relied are
19 self-reports of Harris. No doctors have documented these episodes in person or by way of
20 monitors that have been employed. Although there are reports from friends that witnessed
21 such episodes, their frequency is not documented by the lay witnesses. (AR 342, 353, 362,
22 374, 398, 408.) Thus, the ALJ is correct that there is no objective medical evidence of record
23 documenting the frequency or origin of the syncope episodes reported by Harris and relied
24 upon by Dr. Lindstrom.

25    There are inconsistencies between the evidence that Harris provided to Dr. Lindstrom
26 and to the VA. For example, in March and May 2007, Harris informed Dr. Lindstrom that
27 he was having an episode of syncope a few times per week. (AR 517, 519.) In August 2008,
28 Harris told his new doctor at the Veteran's Administration, Mark Hendrickson, that he had

rare fainting spells, the most recent having occurred three months prior, with more frequent occurrences of lightheadedness. (AR 577, 626.) As another example, he told Dr. Lindstrom that he had not discussed his syncopal episodes with his cardiologist but he told Dr. Hendrickson that his cardiologist could not adjust his pacemaker to address his lightheaded spells. (AR 519, 626.)

Finally, the ALJ is correct that Dr. Lindstrom's opinion, according to the documents in the record, is based solely on reports by Harris and no objective medical evidence. He did not conduct any testing nor provide any treatment to Harris regarding the impairment (sick sinus syndrome) that he opined left Harris completely unable to work. Harris's visits to Dr. Lindstrom were all for reasons other than his sick sinus syndrome, although he would inform the doctor how he was feeling and the status of his symptoms. (AR 515, 517, 519, 521, 631.) In 2001 and 2007, Dr. Lindstrom noted that Harris was seeing a doctor specific to his cardiac problems. (AR 519, 631.) In 2007, Dr. Lindstrom noted that Harris had not told his cardiologist about the increasing number of syncopal episodes he reported to his primary care doctor. (AR 519.) Dr. Lindstrom told Harris he should discuss that with his cardiologist (*id.*); there is no record suggesting that Harris did so. The two cardiology visits documented during this time period, April 2006 and February 2007, both reported that Harris was doing well and that his pacemaker was functioning without problem. (AR 450, 451.) There is no mention of any of the symptoms that Harris reported to Dr. Lindstrom. As mentioned above, there are no doctors that shared Dr. Lindstrom's opinion that Harris was incapable of employment. (*See* AR 42-60, 452-57, 472-79.) Finally, Dr. Lindstrom's ultimate conclusion that Plaintiff is disabled is a matter reserved to the Commissioner and not entitled to special weight. 20 C.F.R §§ 404.1527(d)(1)-(3), 416.927(d)(1)-(3).

The Court finds that the ALJ provided specific, legitimate reasons for discounting the opinion of Dr. Lindstrom and the ALJ's finding is supported by substantial evidence.

**Expert Witness, Dr. Stephen Gerber**

Plaintiff alleges that ALJ Johnson gave weight to Dr. Gerber's opinion to which it was not entitled. Dr. Gerber testified at the hearing as an expert, he is board certified in internal

- 8 -

1  medicine and cardiovascular disease. (AR 40.) He concluded that, as to a physical illness,
2  Harris did not meet or equal any of the listed impairments at Step Three. (AR 42-43.) Dr.
3  Gerber testified that a person with sick sinus syndrome and an implanted pacemaker would
4  be advised to avoid hazards such as heights and machinery, and that Harris did not present
5  any limitations beyond these normally applicable to that condition. (AR 44, 47.) He opined
6  that Harris's complaints of lightheadedness, dizziness and fatigue should not be occurring
7  post-pacemaker implantation. (AR 45.) He noted that a Holter test was negative, which
8  assessed cardiac rhythm disorders for a 24-hour period, as was a tilt table test, which assessed
9  other causes for the symptoms. (AR 45-46.) Dr Gerber could not identify any other evidence
10 in the records that would explain Harris's symptoms. (AR 46.) He testified that he had not
11 seen a case of sick sinus syndrome that did not respond to a pacemaker, and the Holter
12 evidence in this case demonstrates Harris did respond. (AR 56.) He noted that there could
13 be a non-physical cause of the persisting symptoms, such as anxiety. (*Id.*) The doctor
14 acknowledged that too rapid of a heart beat, an irregular heart beat or low oxygen saturation
15 could lead to Plaintiff's symptoms; however, he noted that none of those were well
16 documented in the record. (AR 59-60.)

17       The ALJ reviewed this evidence and used Dr. Gerber's testimony with respect to
18 analyzing the nature and severity of Plaintiff's impairments at Step Three. (AR 109.) Further,
19 he relied upon it as one of several reasons he found Plaintiff not entirely credible with respect
20 to the severity of his impairment. (AR 113.) He ultimately did not give it particular weight
21 as he did with other physicians that provided opinions as to Harris's limitations. (*See* AR
22 113.) However, non-examining physicians' opinions may "serve as substantial evidence
23 when the opinions are consistent with independent clinical findings or other evidence in the
24 record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

25       Plaintiff argues that Dr. Gerber's testimony was erroneous on numerous points
26 specific to his medical history and treatment records, including: (1) Harris's type of
27 pacemaker; (2) the basis for implanting a pacemaker initially; and (3) the number of Holter
28 monitor studies in which Harris had participated. Harris pointed out these discrepancies at

- 9 -

1  the hearing (AR 48-51, 57-58), but they are not critical because the ALJ did not rely on Dr.
2  Gerber's testimony on these points. Neither the particular pacemaker and its function nor the
3  reason it was implanted in 1990 were mentioned in the ALJ's opinion. Although the ALJ
4  mentioned the Holter monitor study and the tilt table test, he cited to the medical records as
5  the source for that information. (AR 113.)

6  Plaintiff argues that Dr. Gerber should not have relied upon certain tests because they
7  did not demonstrate the severity or frequency of Plaintiff's episodic symptoms. Specifically,
8  Dr. Gerber looked to a Holter study and a tilt table study. First, Dr. Gerber suggested in his
9  testimony that there was a second Holter monitor study. The records indicate the second
10 study, in January 2010, was an event monitor not a Holter monitor. (AR 656.) Second, these
11 tests are relevant because they were chosen by the VA doctors in an effort to locate the
12 source of Plaintiff's continued reports of pre-syncope and syncope. (AR 569, 645, 647, 656.)
13 None of the tests revealed a basis for the symptoms of which Harris complains. (AR 615,
14 647, 656.)

15 Plaintiff argues that Dr. Gerber's opinion was inconsistent with the record as a whole.
16 First, he asserts that his opinion conflicts with the scholarly literature that Harris submitted
17 as part of the record. Although an ALJ will consider all evidence submitted, 20 C.F.R.
18 §§ 404.1520(a)(3), 416.920(a)(3), "[m]edical opinions are statements from . . . acceptable
19 medical sources that reflect judgments about the nature and severity of your impairment(s)."
20 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Acceptable medical sources are licensed
21 physicians, psychologists, optometrists, podiatrists, and speech-language pathologists. 20
22 C.F.R. §§ 404.1513(a), 416.913(a). Thus, while an ALJ may consider medical literature
23 submitted by a claimant, it is not a medical source statement specific to the claimant's
24 impairments. *See* SSR 96-5p; *McKinney v. Barnhart*, 62 Fed. App'x 284, 286 (10th Cir.
25 2003). Thus, Dr. Gerber and the ALJ did not err by not giving significant weight to the
26 medical literature when assessing Harris's impairments. Additionally, Dr. Gerber's opinion
27 is consistent with other medical source statements in the record, including Drs. Rothbaum
28 and Shallenberger.

1    The ALJ did not err in his assessment of Dr. Gerber's opinion, on which he relied but
2 did not give special weight.

3    **Expert Evidence for the Record**

4    Plaintiff argues that the ALJ was required to obtain an expert opinion on his cognitive
5 disorder. In support of this argument he cites SSR 96-6p. The section upon which he relies
6 provides that an ALJ must obtain an updated medical opinion when the ALJ finds that, at
7 Step 3, a judgment of equivalence is reasonable or that additional evidence may have
8 demonstrated that an impairment is equivalent. SSR 96-6p. ALJ Johnson had before him the
9 opinions of psychologists Machelle Martinez and Randall Garland, which were consistent
10 and did not support a finding of equivalence at Step 3. (AR 481-88, 491-507.) Because ALJ
11 Johnson found that Harris did not have an impairment or combination of impairments that
12 met one of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1, based
13 on medical opinions, he was not required to obtain an additional expert opinion. (AR 109.)

14    **Vocational Evidence**

15    Plaintiff alleges that the ALJ failed to ask the vocational expert to identify jobs that
16 he could perform, as was required by the Appeals Council remand decision.

17    As an initial matter, the Appeals Council told the ALJ to obtain evidence from a
18 vocational expert "[i]f warranted by the expanded record." (AR 101.) Thus, the ALJ had
19 discretion to make that decision. Regardless, the ALJ obtained the testimony of vocational
20 expert Kathleen McAlpine. (AR 75.) He asked the expert several hypothetical questions
21 regarding the work a person could do if he had the limitations found by the examining and
22 consulting doctor, or if he had the limitations to which Plaintiff testified. (AR 77-81.)

23    Drs. Rothbaum and Shallenberger concluded that Plaintiff could do medium work but
24 should never climb ladders, ropes or scaffolds or work around heights or moving machinery.
25 (AR 455-56, 473-78.) The vocational expert testified that those restrictions would not create
26 any limitations on doing the type of work (light and skilled) that Plaintiff had done in the
27 past. (AR 77-78.) In contrast, the vocational expert concluded that the limitations to which
28 Plaintiff testified would preclude a person from working. (AR 78-81.) The Appeals Council

ultimately concluded that Harris could do medium unskilled work, with limitations on exposures to hazards. (AR 93.)

Because the ALJ and Appeals Council discounted Plaintiff's testimony, they were not required to rely upon the vocational expert's testimony based on the limitations he reported. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005) (finding it proper to rely only on hypotheticals that include restrictions found to be supported by substantial evidence). In light of the RFC found by the Appeals Council, and Harris's age, education and work experience, the Medical-Vocational Guidelines directed a finding that Plaintiff is not disabled (AR 5-6). 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 3; *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007)(affirming the use of the grids when claimant does not have sufficiently severe non-exertional limitations not accounted for in the grid). The guidelines state that someone who can perform medium work, even unskilled, retains substantial work capacity, and there are 2500 jobs the person could do in each of the exertional categories of sedentary, light and medium work. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 203.00; *see also* SSR 83-14 (noting that inability to climb ladders does not significantly affect the occupational base for medium work), SSR 85-15 (restriction from working around hazards such as heights and machinery not a significant impact on work available). Thus, the ALJ did not need additional guidance from the vocational expert on specific jobs that Plaintiff could perform.[1]

**Lay Witness Testimony**

Plaintiff argues the ALJ discounted his lay witness testimony on erroneous grounds. Plaintiff submitted statements by Arturo Prats, Ana Patricia Galicia, Catherine Marie Schaefer and Martha De la Rosa. ALJs must consider lay witness testimony and rejection of

---

[1] In support of his claim that he could not perform any work, Harris relies upon a document from a state vocational rehabilitation program. That document informed Harris that his case was being closed because Dr. Lindstrom stated that Harris was unable to work. (AR 363.) This is not a strong corroborating document because the state agency did not conduct an independent assessment, the decision was based solely on a statement from Dr. Lindstrom.

- 12 -

1  lay testimony requires reasons specific to each witness. *Stout v. Comm'r, Social Sec. Admin.*,
2  454 F.3d 1050, 1053 (9th Cir. 2006).

3  <u>Arturo Prats</u>

4  Prats, who is a pathologist, stated that he has frequent contact with Harris and has
5  observed him experience episodes of lightheadedness, dizziness, confusion, and even loss
6  of consciousness. (AR 342.) Harris's former wife, Galicia, confided to Prats in 1994 that
7  Harris had frequent dizziness, convulsions and fainting spells. (*Id.*) In 1995, Prats observed
8  an injury to Harris's eye area that Harris explained had resulted from a loss of consciousness.
9  (*Id.*) Prats stated that Harris's condition had deteriorated over the years such that he had a
10 markedly reduced ability to safely drive or perform everyday tasks. (*Id.*) The ALJ gave little
11 weight to the testimony of Arturo Prats because he did not indicate the frequency or severity
12 of his observations of Harris's condition. (AR 113.) This is a sufficient germane reason for
13 discounting Prats's testimony. He did not tie his testimony to a particular time period, other
14 than to say that Harris's condition had worsened over the years. Some of his examples were
15 from the 1990s and he provided no sense of the frequency of the symptoms that he stated he
16 had witnessed.

17  <u>Ana Patricia Galicia, Catherine Marie Schaefer, Martha De la Rosa</u>

18 Ana Patricia Galicia testified that she was married to Harris from 1988 to 1998, and
19 she witnessed Plaintiff suffer routinely from dizziness, convulsions and fainting spells. (AR
20 353.) Harris suffered numerous severe injuries during these episodes. (*Id.*) The condition
21 worsened over time. (*Id.*) The convulsions, which occurred when Plaintiff was asleep or
22 unconscious, resulted in a 1991 epilepsy diagnosis (which was later determined to be
23 erroneous). (*Id.*).

24 Catherine Marie Schaefer stated that she had known claimant since the mid-1980s,
25 and had lived in his home from fall 2005 to winter 2006. (AR 362.) During a week, Harris
26 would complain several times of being dizzy or faint, and he would be short of breath with
27 clammy skin. (*Id.*) She once found Harris unconscious on the floor and it took him several
28

hours to fully recover. (*Id.*) She noted that Harris had difficulty driving because he became tired quickly. (*Id.*)

Martha De la Rosa testified that, as of July 2010, she had been living in Harris's house for five months and provided care for him part time. (AR 374.) She observed that Harris is often short of breath and needs rest breaks during the day. (*Id.*) She had witnessed three occasions on which Harris awoke fitfully and was disoriented, had difficulty breathing and a rapid pulse. (*Id.*) She also saw Harris lose consciousness and convulse on one occasion. (*Id.*) She indicated that riding in the car caused Harris fatigue and anxiety. (*Id.*) On July 27, 2010, De la Rosa listened to Harris's heart while he was sleeping and gasping for air, it was beating repeated brief runs of very rapid beats corresponding to his gasps. (AR 398.) In a November 2010 update, De la Rosa stated that Harris is frequently fatigued after walking even short distances, he becomes unsteady, cannot carry anything and has difficulty concentrating, and his pulse is unsteady. (AR 408.) She also observed that Harris rests two or three times per day, complaining of fatigue. (*Id.*)

The ALJ discounted the statements of Galicia, Schaefer and De la Rosa because they are not medically trained, thus, the accuracy of their statements is questionable; they are not disinterested third parties in light of their relationships with Harris; and their opinions, like the claimant's, are not consistent with the preponderance of the opinions and observations of the medical professionals. (AR 114.) The first two reasons provided by the ALJ for the rejection of these opinions are legally insufficient. The regulations provide that, when evaluating a claimant's impairments and how they affect his ability to work, the ALJ will consider evidence from non-medical sources, such as family, care givers and friends. 20 C.F.R. § 416.913(d)(4). The evidence cannot be rejected because it is provided by the sources identified in the regulations, non-medical persons with a relationship to the claimant. *See Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) (family members in a position to observe the claimant's symptoms and activities are competent to testify as to his impairments). The remaining basis provided by the ALJ was that the lay witness testimony was not consistent with the preponderance of the medical evidence or the opinions provided

- 14 -

by medical sources. This is a specific germane reason on which an ALJ may rely. *Bayliss*, 427 F.3d at 1218; *Bray*, 554 F.3d at 1227 (finding error harmless if at least one reason for discounting lay testimony is valid). Prior to reaching this conclusion, the ALJ had detailed the medical evidence and opinions. His conclusion is supported by substantial evidence in the record.

Additionally, any error in discounting this lay witness testimony is harmless because their testimony was similar to that provided by Harris, which the ALJ discounted for valid and supported reasons. In other words, when an ALJ relies upon legitimate reasons and evidence to discount a claimant's credibility and those reasons are equally applicable to the lay witness testimony, any error as to the treatment of the lay testimony is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012); *see also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (finding rejection of lay witness testimony that was similar to claimant's testimony valid for same reason claimant's was rejected). Here, the ALJ found Plaintiff not entirely credible as to the same symptoms reported by the lay witnesses: limited energy, disorientation, shortness of breath, dizziness, and fainting. In support of this, the ALJ relied upon the medical records, objective medical evidence, medical opinions and daily activities. (AR 111-14.) In particular, he noted that the pacemaker records and testing conducted did not provide evidence of a cardiac or other explanation for the syncopal episodes reported. (AR 111, 113.) Multiple doctors opined that Plaintiff could work with certain limitations. (AR 111-13.) Additionally, Plaintiff reported independent activities of daily living including caring for himself, driving, cleaning, cooking, socializing and volunteering in the community. (AR 112.) When considering the record as a whole, any error by the ALJ in his treatment of the lay witness testimony is harmless because it does not alter the outcome of the case. *See Molina*, 674 F.3d at 1115.

### Examining and Consulting Physicians

Harris argues that ALJ Johnson gave weight not due to the opinions of non-treating physicians. He cites law regarding the factors an ALJ should consider when weighing medical opinions, such as the medical evidence, qualifications, and explanations for opinions,

1 and he asserts that the ALJ uncritically gave weight to non-treating physicians. However, 2 after listing these factors, Plaintiff does not argue or demonstrate that they were improperly 3 weighed by the ALJ with respect to any specific non-treating source in his case.[2] The Court 4 finds that the opinions of these non-treating sources are consistent with one another and with 5 the record as a whole.

## **CONCLUSION**

Plaintiff fails to demonstrate that the ALJ's opinion is legally erroneous or not based on substantial evidence in the record. This decision does not determine whether Plaintiff is in fact disabled under the governing framework, particularly as he has been found qualified for SSI as of April 2011 (*see* Doc. 14 at 4-5). Rather, the Court has determined only that, based on the record before it, Plaintiff has not established that the Appeals Council committed reversible error.

Because Plaintiff has been awarded SSI, although not from the date at which he first requested it, the Court clarifies its ruling specific to Harris's request for DIB. In order to qualify for DIB, Plaintiff had the burden of satisfying Steps One through Four as of March 31, 1980, the last date he met the insured status requirements. The record contains almost no records prior to 2001. The only records related to the period prior to 1980 are the four pages of military records related to his discharge, which do not diagnose sick sinus syndrome nor any cardiac issue. Although Plaintiff concludes that his symptoms remain the same and his current diagnosis applies to that time period, there is no medical evidence of that assertion.

---

[2] The only specific argument Plaintiff makes is that the ALJ erroneously identified psychologist Randall Garland as a physician. This is not accurate. The first time the ALJ discussed Garland's opinion, he identified him as Randall Garland, Ph.D. (AR 112.) In later references, the ALJ refers to him as Dr. Garland, which is proper as he holds a doctorate degree in psychology. The ALJ used the same nomenclature for Machelle Martinez, also a licensed psychologist with a doctorate degree. (AR 112, 113.) Licensed psychologists are acceptable medical sources under the governing regulations, similar to licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

- 16 -

Further, there are no medical opinions regarding his impairments and level of functioning during this period. These records are totally insufficient to establish Plaintiff's DIB claim.

Accordingly,

**IT IS ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court should enter judgment and close this case.

DATED this 19th day of December, 2012.

D. Thomas Ferraro
United States Magistrate Judge